and I guess Mr. Dingwall is first up. Thank you, Your Honor. Good morning. I guess we're still morning. And may it please the Court, I'm Jeff Dingwall on behalf of the appellants, and I'll be sharing time with my co-counsel here, Greg Paul. I'm going to be addressing the procedural issues, and then Mr. Paul will address the substantive legal issues, including the FMLA interference and the honest belief issues. The district court here, in just two short pages of analysis, granted a summary judgment against more than 50 plaintiffs, including the appellants here, and in doing so, made clear credibility determinations in favor of the defendants as the moving party, weighed evidence against the plaintiffs as the non-moving party, and resolved all inferences against the plaintiffs as to their evidence. And this really comes into focus when you consider the two proffered reasons that CSX and the defendants gave for firing the plaintiffs in this case. Number one is they claimed that the plaintiffs were engaged in a conspiracy to defraud the Congress, and that the plaintiffs were engaged in fraudulent acts. And the district court used that as a basis to state that the defendants had asserted a legitimate non-discriminatory reason for the terminations. But the district court ignored the fact that Dr. Heligman testified in depositions that he had no such evidence. That, in fact, it was pure speculation, that's a quote, that he felt the plaintiffs were engaged in a, quote, unconscious effort. And Dr. Heligman testified that he took no issue whatsoever with the documents that were submitted on behalf of the plaintiffs by the chiropractors. Specifically, he said he took no issue with the diagnoses that were on the forms or the treatment that was prescribed. He looked at the circumstances and said these circumstances smell. You have 50 people giving the same type of claim, going to the same chiropractor, getting the same report, getting the same eight weeks off or whatever it is, and all coming up to a potential furlough. And he concluded that this didn't smell right, that the injuries were of different magnitude, that they were more particularized. And I must say, if you presented the facts, the similarities to some jury, they would say it smells, too. And I think they acted on that. That's what they were acting on. And your questions, Dr. Heligman, I'm sure, will be answered. The company representative was basically sure it's speculation. All circumstantial evidence speculates to some extent. It fills gaps. But there was real evidence there that supported what the, or tended to support, what the company concluded, which was that this was a program to extend benefits or to get benefits without justification for them. Now, it's not 100% sure or whatever, but it was a program to extend benefits without justification for them. But that's the way they acted. And I think to parse the testimony and say he said it's speculation and this, sure it is speculation. When you don't know something, it's got to be speculation. But it's reasoned speculation based on the other facts that you do know. And so I think to be fair, you have to recognize the indicators that make this case look strange. Sure. And I don't think anyone here would ever suggest that a company couldn't look into something like this or even shouldn't look into something like this. Part of the issue here is that the company swept everybody out with the same group. Well, the 50 people who were, they were all fit that pattern. I mean, the gross aspects of the pattern. And I didn't give you all the details, but it even goes to the same language and goes to the same two health care providers. And I don't think anyone here would ever suggest that a company couldn't look into something like this or even shouldn't look into something like this. The similarities are striking. But anyway, I just wanted, you were sort of tending to suggest that the company was acting baseless by saying they were relying on speculation and this stuff. I think the record is pretty strong that they were acting baseless. They were reacting in response to something serious. They were certainly reacting to something. And Dr. Helligman's testimony has been pretty clear that he thought there was a pattern and that's what he acted on. But when you really get into the facts and you look at what they actually accused these individuals of, when they accused them of it, and then the actual evidence that they had to back that up, it's a very different story. When you say what he acted on, what's in front of us is that there was a pattern. Termination and the FMLA decisions. None of those actions weren't taken by the doctor. The doctor presented testimony to a labor relations team who made a recommendation to a gentleman who then made this decision. So the decision, the action in front of us is not the doctor's decision to investigate. It's the multi-step process required by the CBA, I believe, to make this decision, right? Yes, and that's where the ruling by the district court gets a little muddled because on the one hand, the district court credits Dr. Helligman for his belief that there was this fraudulent activity going on as evidence that this was legitimate, non-discriminatory reason, but on the other hand says that we cannot rely on Dr. Helligman's actions to prove our case of pretext. And the district court then goes on to say there was an unnamed decision maker. I thought it was named. I thought it was Brian. He was named in the briefing, but the district court did not name him and also did not make any findings as to what he may or may not have relied upon. Isn't that your job? If you're supposed to show pretext, you're supposed to show what Mr. Barr relied on that was not the legitimate reason? Yes, and we did present this to the district court and I think it's undisputed that Dr. Helligman was the only witness in these disciplinary investigations to present the company's case. There was no other evidence brought in. So the only thing that could have been relied on of the chain is the evidence that Dr. Helligman presented. And even beyond that, if we want to look at this process, this collective bargaining process, as we cited in our briefing, the Fresquez case of the 10th Circuit, that court looked at it and said, yeah, sure, they have this process that they follow and they have to follow it, but there's absolutely, it's the province of the jury to determine whether that process is weighted in favor of the employer. And that's certainly the case here. Every step of the way in that process is controlled by the employer. In fact, there's obviously no attorneys, there's no discovery, there's no advance notice of the charges. They don't know necessarily what rules are even being brought up. But on most of the claims you were talking under, we're talking about a pretext issue, not on the interference. I know your argument on the honest, that's another issue. But on most of them, we have a McDonnell Douglas thing and you're trying to poke at the pretext. And it seems to me that you have to focus on the decision maker and what he had before him and not the weakness of the underlying evidence, which maybe did not come to him. He acted on a recommendation and on the data that was presented to him and made this decision. And the question is, was that a pretext for something else or was it a real response? And I suggest there's a really strong, as a matter of fact, it seems almost conclusive, strong evidence that the only reason he acted, because he believed there was, not a conspiracy, but a group of people who were involved in the case, people that got together and said, this is what we're going to do to get additional benefits. And they all called in sick and all had the same doctors and all had the same days, same amounts and same symptoms. And so the man says, we'll fire him. But that's the reason he did it. He may have been wrong, he may have been right, but the question is, was it pretext? And that's where I think you probably have to direct your attention if they're wrong. You have to say the reason they gave is not the real reason. Right. And to the decision-maker issue, the problem is we just don't know from the district court's opinion what it... No, but you know what the record says. I know what the record says, but we still have to rely on what the judgment was. And the judgment in the Four Corners made no reference whatsoever to, on the one hand, he credits Dr. Helligman's testimony and does so in favor of the moving party. On the other hand, it says we can't rely on that same evidence or his same actions to prove our case of pretext because somebody else made a decision. And it can't cut both ways. And so on the evidence of pretext, we have all this information that we've put forth to the district court, including the fact... Information that was presented to the decision-maker. That's the key. Because the decision-maker may not have had all the evidence. The decision-maker is making a decision based on what's before him. And in this case, that's what you have to focus on because the question is whether the decision-maker is honest in making the decision or made it for some other reason. It was a cover-up, a pretext for something else. And we know, and I think it's undisputed, what was in the record before the decision-maker because the record is cold. The record is what happened in these investigations, and we know what happened in the investigations. We know what Dr. Helligman said, and then we know what he later said. And his testimony is completely at odds from what he said in these investigations to what he said under oath in the deposition. All right. I think you have some rebuttal coming. We've let you go here. Oh, I'm sorry. We'll hear from Mr. Paul. Good morning, and may it please the Court. My name is Greg Paul, and I want to thank you for allowing us the opportunity to have this oral argument. I want to start first just addressing the FMLA interference. I'm not going to get into the history about the prescriptive and proscriptive because this Court's ruled on that in Sharif v. United Airlines, and particularly at page 203, quote, unlike prescriptive entitlement or interference claims, employer intent here is relevant, referring to that case, which was only a retaliation. So I think we're all clear on that. What gets a little difficult is knowing that an interference claim is a benefit, it's much comparable to an ERISA benefit. It's either approved or denied, and those are really the options. What happened here was not insignificant. As we set forth in the brief in some detail, the FMLA process, which everybody admits the Certificate of Ongoing Illness form is not an FMLA form. That's something that is recognized in the record as notifying the company of possible FMLA. And then what that would have triggered is critical. It would have triggered a medical certification form that the employer or doctor had to complete within a certain period of time. I think it's 16 days. And then the employer looks at that, and it has questions. It can ask them, seek clarification. It can get a second opinion, a third opinion. And so all of that would have showed the company whether this was a legitimate medical absence or not. And that didn't happen. And it didn't happen. There's testimony from Dr. Helligman and the nurse that worked there that boxes were checked on their screen that this should have been FMLA eligible. And that benefit never got processed. Can I ask you kind of a what's the harm question? Looking at the record, it looked like, and I'd like to know if this is right, but looking at the record, it looked like these employees, when they made these claims and when the company thought something was up, they were all put on leave. And in the district court hearing, the attorneys confirmed that the employees immediately were put off work and their entitlement to benefits, insurance, etc. all continued. And their jobs remained protected until this process played out. And then most of them were terminated. And I think Mr. Stewart was reinstated. So I was kind of left wondering, they basically got leave until the process was completed. What's the prejudice? Well, they got off work, right? I mean, just like anybody can not show up to work when they presented that evidence. But they got a charge letter and had to have a hearing. So much like someone who takes leave, and actually a lot of the cases the defendant cites are people who were approved for leave, and then they did something kind of weird on leave, whether it's going to the construction house or riding a snowmobile, whatever. But those type of cases, that calls into question the legitimacy of the leave. But here, what's important is their leave was never protected, which is why they ultimately got fired. Had they been advised of their FMLA rights and responsibilities, submitting those forms would have made it legitimate, would have made their jobs protected for 12 weeks. That's all right, but what harm did they actually suffer by the company not instigating the FMLA warnings process and letting them know that? What was the actual tangible harm to them? Well, the tangible harm is, not to repeat myself, but all of those medical forms would have substantiated the absences, and the collective bargaining agreement process is not suitable for that. That's a totally different process. So by nature of having their doctors being able to substantiate or not substantiate the absence, whatever the case may be, that's... But they could have put all that evidence in during the collective bargaining pre-approved process, right? Not the FMLA paperwork, not the FMLA process. I mean, they could have put in evidence from the doctors saying this really was legitimate and all that. I mean, I think that's a separate issue. I guess they could have done something, sure, but the FMLA... So you're saying the prejudice is, if they had gone through the FMLA process, there would have been a different outcome. They wouldn't have been fired. Well, some may have. I mean, I don't know, but there are two different paths. And what I'm saying is that the FMLA path, this federal law, is totally separate than whatever is required under the CBA. And that that would have absolutely... I mean, an employee could have decided not to do it, right? And that's their problem. But by knowing the rights and responsibilities to submit that FMLA paperwork, it would have made crystal clear what their absence was for and whether it was protected or whether it wasn't. I'm confused by your argument here. I'm still not understanding what the difference is in response to Judge Brushing's question, because there was a hearing process here. And my understanding of the record is that your clients didn't present anything, which it seems like whatever you're saying they could have done by following this other path, I don't understand why they couldn't have done it in this hearing. So I'm having trouble understanding what the deficit is. That's a great question. I mean, there are separate paths. But a lot of the individuals, when they got this letter saying you're accused of being in a conspiracy to engage in fraud, had no idea what it meant. They knew that it was triggered by the Certificate of Ongoing Illness, for sure. But that's all they knew. The federal law FMLA is not overridden by a CBA. It's a separate path. And that path would have clarified their medical conditions, what their treatment was for. So that's a really significant harm, in addition to the fact that most of those... You're saying, under the process that came about in this case, they could not have known any of those things? I mean, they had lawyers, right? They did not have lawyers. No, no. They're represented by a union representative talking about a work rule. And their union representatives are often just co-workers. So there's no lawyers. What's the sequence on here? The sequence is they took leave pursuant to the doctor's orders, right? Yes, they submitted the COI form. They faxed it or someone faxed it, yes. And they each got eight weeks leave there, right? Well, the doctor's form suggested a range of six to eight weeks, but they were charged for submitting that form. I understand, but the sequence was they took leave. Now, when do you argue they should have gotten notice for FMLA? And, Your Honor, it's not just an argument. It's testimony from the FMLA Court. I know. When? As soon as that COI form came through the fax to the medical department, that triggered notice. That was notice of the potential. All right. So let's assume, just for the hypothetical here for a moment, that their claim for leave, medical leave, is fraudulent. But they get the benefit of it. They're going to leave. And now you're saying they should have been spared that conduct because if they had gotten the FMLA notice, they wouldn't have gone through the fraudulent conduct. Not necessarily. Like you said, there are two separate paths. If somebody submitted an FMLA certification form, in any case, and an employer thought it was fraudulent, they can question that. There's a procedure under the FMLA to do that. And they can either approve it or they can deny it. And if they deny it, then that's unexcused absences. And they can be charged with that. Right? Or if they do something else, they can be charged. But it has to be approved or denied. And that paperwork triggers that process. It does trigger it. But the process, the whole thing was triggered by their, let's assume it's totally fraudulent. This is all made up injuries. And they just went and took leave. They got this doctor's business. And you're saying because it's fraudulent, they still should have gotten an FMLA notice after they turned in their fraudulent document? But under this hypothetical that it was fraudulent. Yes. Yes. Sure. I mean, that form would explain. In other words, they turn in the fraudulent document first and then the company reacts and gives them a legitimization of that fraudulent. Absolutely not, Your Honor. What the company is required to do under the FMLA is to give them a blank form that they have, like I said, 15 or 16 days to complete. Well, I understand. But it seems to me, it seems to me you're talking about whether they actually have a right to interfere with the right. There's no intent aspect of it under our case law. So the question is whether they interfere with the right. But if it's made up and concocted, there is no right. Well, when I say rights and responsibilities, that's actually like there's language in there that tells what the employee has to do and what the employer has to do. So that's more generic language. What's important here is that by getting that FMLA form, right, and it's conditional in any FMLA case, right? I mean, you may be conditionally approved for FMLA, but until that form comes back from the employee and the health care provider and is approved by the company, it's not approved. So we're not trying to say, oh, give me the FMLA paperwork and we're free. Well, my question then gets to the question where Judge Rushing asked you. If their leave was prompted by the fraudulent conduct and they're now on leave, how are they hurt? Well, because they're not on leave until it's approved, right? And they got charged. So it's not just like you give them the paperwork, you're automatically approved. How much time from they submitted their document for, let's say it's a fraudulent, hypothetical fraudulent document to get leave, medical leave, the doctor made it all up. In this particular case, how long was it after they submitted the document that they were on leave? I'm not sure I understand. How long? Didn't they take leave? Well, after they presented the CLI form, they did not go to work. They didn't go to work, right? Right. That's not approved leave, though, Your Honor. I know. They just stayed home from that point on. And the question is, that's all they would have gotten under the FMLA is to stay home. Well, again, the process is incredibly important here, as I've said. Well, it tends to legitimize it, maybe. It does, and there would be a process for them to challenge it. But that legitimizes something that was already a scheme of... Under your hypothetical. I mean, right. At that point, there may have been suspicions, like there could be any suspicions, even on an FMLA form, and that process would clear that out. But the CBA process is not the FMLA process. I know I'm over my time, and I'll maybe address the honest belief. All right. Mr. Schmalzbach. Good morning, Your Honors, and may it please the Court. This case is, as the Court said, about a purported epidemic of soft tissue injuries, an epidemic that is limited to off-work CSX employees, and an epidemic that appeared immediately after the first furlough announcement was posted in Huntington. The only question that needs to be resolved on this appeal is whether CSX discharged plaintiffs because it believed they had dishonestly participated in that epidemic. And what that suspected dishonesty means is that they sought out two whole months of leave, a uniform two months of leave, to extend benefits they weren't entitled to. So I'd like to address a few reasons why the District Court was right to grant summary judgment. The first is why CSX believed that this was dishonest. Second is why there's no evidence that that belief was pretextual. And third is why the interference claim also should be resolved, and, as the Court recognized, because there was no prejudice. An absence of paperwork isn't prejudice. It made no difference to them. So starting with why CSX believed that this epidemic was literally unbelievable and showed prejudice. There's five particular reasons that this wave of COII forms doesn't pass the spell test. The first is the number. Dr. Heligman called it unprecedented. He had never seen anything like it. Over 60 forms submitted in less than a month and a half from the same two doctors. The second reason is the duration. Each of them provided two whole months of off work for injuries that, in Dr. Heligman's experience, didn't require anywhere near that long. And the forms included no justifying details that would explain why you need two months off for injuries like muscle sprains. Third is that each of these purported injuries occurred off work. Not a single one occurred on the job where they would have been observed by other CSX employees. Fourth is the timing. The announcement of the first furlough was posted on a Friday, and on Monday we see 16 COII's smashing the previous record and continuing for the next month and a half. And last, and very significant, is the motive. So none of the COII forms were submitted before the furlough notice was posted? There were COII forms for different providers and different plaintiffs, but for the plaintiffs in this case. And the reason that's important is the motive connected with the furlough. So ordinarily, if an employee is furloughed, those benefits continue for four months under the collective bargaining agreement. But the CBA provides a different rule if you are furloughed while you're on medical leave. Then it extends it from four months to two years, a six-fold increase in benefits, and a powerful incentive to file these forms whether they were true or not. So next I want to address the CBA process, which is a key part of the belief of CSX that this was the product of dishonesty, not the product of an enormous coincidence that all 67 of these forms happened to be filed during this time. So first, the CBA gives all the plaintiffs an opportunity to clear their name. They are represented not by counsel, but by an aggressive union representative. And I think if your honors look at the transcripts of those hearings, you'll see that those union representatives were very active and did a very good job representing their clients. I also need to correct something that my friend on the other side said, which is that the only thing that could have been relied on in those hearings was Dr. Helligman's testimony. It is absolutely incorrect. There was ample opportunity for each of the plaintiffs, each of these employees who were charged, to put in their own evidence, to put in their own medical documentation, to offer witnesses of their own. Another thing I need to correct is that they didn't have advance notice of the charges. They absolutely did. Each of these plaintiffs received a notice of charges so that they were aware of what this hearing was going to be about. They were aware they could bring witnesses. They were aware they could bring their own evidence. But it didn't stop there, because even after that investigation hearing, plaintiffs had the opportunity to pursue an appeal to the public law board. That's important for two reasons. One, a majority of the panels on the public law board were comprised of non-CSX personnel. So this isn't a process that's controlled by CSX. And second is that the public law board does actually give substantive review. It's reviewing the decision of the investigation hearing for substantial evidence. It cites the 1938 Supreme Court case in Con Ed, and asks, is there sufficient evidence for a reasonable person to draw the conclusion? In this case, the conclusion that plaintiffs had been dishonest. And so what resulted from that in the case of these plaintiffs was a careful assessment of the evidence. You see a great example of this at page 677 of the JA, where the public law board is going through all those same reasons that I just identified and why that shows this was likely the consequence of dishonesty, not of coincidence. And in some cases, the public law board did reinstate some employees who found that they had provided sufficient evidence that their particular COII was the fruit of a legitimate medical need for two whole months of leave. So what plaintiffs really want is a rule that employers can't consider the results of public law boards, can't consider the results of the CBA process when deciding whether plaintiffs, whether employees had violated company rules, like the company rule against dishonesty. That can't be right. This is why this process exists. It exists to sort out exactly this sort of factual dispute, and CSX appropriately relied on it here. And for what it's worth, the plaintiffs did concede CSX's belief that this leave was sought for the purpose of extending benefits and not for a legitimate reason. At JA 60, paragraph 382 of the complaint, where the plaintiffs themselves alleged that the disciplinary investigation revealed that the defendants believed that more than 60 employees submitted these forms from these two doctors in order to obtain extended benefits. So when you have all that evidence of CSX's belief, and you even have that concession in the complaint, there's an enormous burden for plaintiffs to show that this was pretext. But the court has already identified why plaintiffs don't have that evidence here. The most straightforward reason is that they don't look to the actual decision maker. To look to whether a decision is pretextual, we have to look to the person who made the decision. And here the evidence is undisputed that that person was Brian Barr. You can see the testimony, which is undisputed at JA 2448. And he testified without contradiction that he was the one, he considered the evidence provided at the investigation hearings, and he was the one who ultimately made the decision. And he testified again without contribution. He made the decision to terminate plaintiffs because he thought they had been dishonest. There's no evidence of pretext from anyone else at CSX either. I know plaintiffs want to focus on Dr. Helligman, but he wasn't the decision maker. But even if we consider him, he consistently testified that this spike in forums immediately after the furlough announcement was dishonest. That this was powerful evidence of dishonesty. And that he saw nothing in those investigations hearings where the plaintiffs had the opportunity to clear their names that changed his mind about that. So while he wasn't the decision maker, his explanation is consistent. It doesn't vary. It is always the plaintiff's dishonesty. And last, I'd like to briefly address the interference claim. And I'd specifically like to address the prejudice problem. Because your honors are asking the right question. So what? What is the actual harm to plaintiffs from what they allege are improper processing of FMLA paperwork? So, it is their burden to show that there was prejudice. But they have no evidence, no evidence at all in the record of any prejudice that they suffered. So first, to Judge Rushing's question, you're absolutely correct that the evidence is that they did receive the same pay, the same health and welfare benefits that they would have had they been on technical FMLA leave. So there's no prejudice from what they actually received. Their other argument is that we should have gone through the FMLA process and gotten a second medical opinion. But this court addressed that exact argument in the Rhodes case, which is 257 F3rd 373, which was cited in the plaintiff's opening brief. And Rhodes considers this argument that if the company doesn't believe an employee's leave claim, then that employer has to get a second opinion. And this court rejected that argument. It said that Section 2613 C1, where that second opinion process comes from in the statute, is permissive. It says that an employer may seek out a second opinion. It's an employer's right, not an employer's requirement. But even if there were such a requirement, there's not. But even if there were such a requirement, there's no evidence that it would have made any difference here. Because plaintiffs already had that opportunity to show that a second opinion would have bolstered their claim, would have corroborated their two months of leave for muscle sprains and similar injuries with legitimate medical need. They had that opportunity, and none of them were able to persuade any of the decision makers along the way that they did have a legitimate medical need for that whole two months of leave. So there's no prejudice. And all that the plaintiffs have offered on that point is that they said that that would have given them a chance to show whether the leave was legitimate or not. But that's not the question of prejudice. To show prejudice, they would have to show that, in fact, they would have been entitled to leave. They would have kept their jobs if we had gone through this process, if we had processed the paperwork differently. But it's not enough at this point for an attorney to speculate what would have happened. At summary judgment, the burden was on them to show evidence of prejudice. They have failed to do so. And so for these and the other reasons in our brief, if the court has no questions, we would ask you to affirm. All right. Thank you, Mr. Schwarzwald. All right, Mr. Dingwall, I think you're next. Thank you, Your Honor. I think it's important to remember the posture of this case and how the district court disposed of the case because all of the findings by the district court in granting summary judgment in favor of the defendants were based on credibility determinations, for example, what Dr. Helligman and what CSX believed, on weighing of the evidence, for example, saying that the district court simply didn't believe our arguments of pretext and in resolving inferences in favor of the moving party and against us. And that happened throughout the opinion. In fact, it's really the entire basis for the district court's grant of summary judgment. And that's really the big issue here is what should have gone to the jury. And certainly there was sufficient evidence of material fact that should have gone to the jury. And that includes the... Well, it seems to me there's really only, setting aside the interference claim, there's really only one question is whether the decision made by CSX was a pretext. They don't argue about the other criteria. They go right to the pretext issue and they say there's no evidence to show pretext. And that's an absence of evidence. It's not a question. It could be a question of fact, but you have to come forward with evidence to demonstrate that the decision maker did not make the decision based on the evidence before him, but rather for some other reason. The district court never made any findings as to what the quote-unquote decision made. It doesn't need to make findings. It's an absence of evidence. It's not an absence of evidence. Well, what's your evidence on pretext? That's what I've been trying to press you for. The evidence is from the very beginning. Long before even any of these hearings were noticed, Dr. Helligman and CSX sent a letter out to all these insurance providers and to the Railroad Retirement Board and said this is evidence of fraud. So they had made their mind up from the get-go and actually accused them of fraud when Dr. Helligman said he had no evidence at that point. Why don't you tell me what Brian, the decision maker, made? What did he know? What was he presented with? He knew that because that was in the record in the investigation. Those letters were in the record, as were all of the COII forms, as were all the text. Do you see how that's not an argument of pretext? That's not an argument that they fired them for a different reason. That's just an argument that they made up their mind about this reason really early, right, that from day one they thought there was fraud. And, you know, you may think that the evidence didn't show that and that the appellate board should have disagreed with that, but that's not proof that they didn't fire them for fraud. That's not an argument about pretext. That's an argument that, you know, they came to a conclusion very early about this very same reason for firing them. Well, the pretext comes into play, and this is the Sears case that's cited, is the shifting explanations and the mistakes of fact, and that's replete throughout the record. What's the shifting explanation? You said from day one they sent letters out saying, this is fraud, the employees are lying, and then Mr. Barr says I fired them because they were lying. The shifting explanation is Dr. Halligman saying, I didn't have proof they were lying, but I thought they were lying. That's what he said. But that's a fact question for the jury. No, it's not. That's not about pretext. That's about whether he was right. That's not the question for the jury. The question for the jury is, was that the reason they were fired? Right. Well, there's numerous issues of pretext. That's one, for example, that he was claiming it was fraud and we knew it wasn't fraud, and the reason why he wanted to make it fraud was, just as was acknowledged here, they wanted to save on benefits. They didn't want to pay these employees benefits for a term of two years or a year or whatever it was. They could get away with paying them for four months. No evidence of that. I'm sorry? No evidence of that. Anyway, I think your time is up. Why don't we hear from Mr. Paul? Thank you, Your Honor. If I could just follow up on that. The evidence of the two years versus the four months is at JA2163-5-2164.22, and the Pelley's brief had paid seven. That was their motivation for trying to get out and paying those extended benefits. What's the evidence of that? The evidence of how they benefited by – No, no, how they benefited. What is the evidence the decision-maker was trying to do that? In other words, the decision-maker thought there was dishonesty here. And the decision-maker had a lot performed, and they had a whole process leading up to why they thought it was dishonesty. You can poke holes through that, but that doesn't go – they made the decision that these employees were dishonest and fired them. And so now the question is, did they fire them for dishonesty or did they fire them for some other motive? So what was before Mr. Barr and under the collective bargaining agreement is limited to the hearing transcript and the exhibits that were at the hearing transcript and those exhibits like the charge letters and the letters that were sent accusing them of fraud. What changed is that conspiracy to engage in a fraud and the actual proof along the way that that was a predetermined decision that Dr. Helligman made and that that was not justified. Well, let's assume you're right, but they chose to follow that. I think that brings us right to the honest belief point. There's no pretext. They didn't do it for some other reason. It's clearly they thought he was dishonest, and that was presented to the review board and all the other – from the get-go, there was a suspicion of dishonesty here because of the announcement of the furlough and then the 16 or 17 application of taking leaves, and then it continued with the same people and all the same pattern. And they said, this is dishonest. That's what they concluded. Now, they may be wrong, but that's what they concluded, and now your task is to say they didn't act on that. They acted on something else. And the district court applied that honest belief doctrine which this court in footnote 2 of Sharif says is not necessary. Well, that's the interference claim. You're mixing up apples and oranges. I'm talking about the McDonnell-Douglas thing, the pretext. My question was basically, there's no evidence that I could see that this was pretext. That's where the district court concluded. Set aside the interference claim. Well, I know, but the court also applied the honest belief to the pretext claim, and I just want to set forth that that's not any kind of separate doctrine. I mean, honesty on a spectrum of lying, and that falls under credibility, which goes to McDonnell-Douglas. So there's no need for this honest belief. It just falls within a credibility determination. Or, as I mentioned in the brief, some courts have found it to be a jury question, whether what someone believed or didn't believe. But what I think I hear Your Honor saying is that because they made a decision on day one of something they suspected, and we don't take issue with them charging them or investigating them in the first instance, but the fact that along the way, particularly without the benefit of the FMLA paperwork to substantiate that leave, was extremely harmful for them. Because that would have established, either whether it was or not medically necessary to take that leave of absence. And just to respond briefly, if I said this, I misspoke. I never meant to say that a second opinion under the FMLA regulations was required. Absolutely not. What's required is a health care certification from the employee's health care provider, and then the employer, if it has questions, has all these options, including a second opinion. So, bye. Thank you very much. Thank you.
judges: Paul V. Niemeyer, G. Steven Agee, Allison J. Rushing